May it please the Court, my name is Randall Cunliffe. I am counsel for Austin J. Shelton. I would like to reserve five minutes. The government opines in their brief that Shelton cites no evidence to suggest that anything is being done even at this late date to secure FEMA consideration at page 26. At page 56 they state that Shelton does not argue on appeal that further investigation has in fact turned up any evidence to controvert the information provided. At one place in our reply brief we pointed out that it is not our intent to supplement the brief with things that happened after this matter was decided. In their 28J letter the government states on page 2, contrary to the appellant's claim time at reply brief 12, jury unanimity was not required. Indeed at page 37 of our opening brief we stated that counts one and two provide two different theories upon which Shelton could be found guilty. In the absence of special verdict forms is it impossible to ascertain the unanimity of the jury as to these counts. In their 28J letter the government went on to make arguments which are not appropriate trying to establish that the brief and the facts of Shelton somehow comply with the case of Cabrera that they cited in that 28J letter of October 13. But the case and the facts that they cited are not contained in the record of the case below where they argue that Shelton actually received or the Department of Revenue and Taxation actually received Parks and Recreation, I apologize, actually received monies from FEMA when indeed at page 9 of the indictment or superseding indictment they specifically plead that no such monies were ever received and I don't believe there's any evidence to indicate that FEMA ever reimbursed any of the projects that were specifically included in the crimes charged against Shelton for these matters. The first matter that I would like to discuss from the briefs is the upward departure. The court and essentially based its argument on the loss to the government. Under the guidelines 2C1.1B2, the first prong provides for, among other things, loss to the government, and the second prong is if the person is an elected official, increase by eight whichever is higher. Both the probation office and the court determined that level B, an eight level increase, was higher and therefore increased his base offense level by eight. The court then in its determination that it was going to make a departure, among other things, determined that an increase outside the guidelines was appropriate because of the harm to the government. Therefore, doing what the guidelines specifically say you cannot do, apply both A and B of 2C1.1B2. There is also a great deal of discussion in that issue with regard to the fact that FEMA may not help the government of Guam in the future and that harm is not taken into account. I believe that if you look at the facts of this case, this is not some extraordinary case where someone has done something which has never been done in the history of the United States before and that is being charged with defrauding someone based upon funds that will be coming in from a federal agency. In this case, the amount of money is not extraordinary. It's $100,000 plus. What's the $100,000? What amount of money is not extraordinary? What's the $100,000? The amount of money that they claim Mr. Shelton took in kickbacks for giving the contracts. That's the crime. I mean, the work that was done on behalf of the government. But when you're talking about the harm to the government, it spins out to a different number. It's not $100,000. Well, it depends on what the issue is. The issue is what did the government get? The government got projects completed at a cost which was increased by a certain amount of money. And that amount of money is the harm to the government. Now, the second question is if FEMA was going to reimburse the government of Guam, are they also harmed because they didn't get that reimbursement? That's a speculative determination that no one ever reached. And the court even agreed. It was speculation that they might get the money, they might not get the money. Indeed, the government of Guam was still owed $20, $30 million from Typhoon Baca, which would be appropriated by the federal government. So there's numerous monies out there that the government of Guam claims it was owed because of Typhoon Baca that have never been paid by FEMA. Be that as it may, the court remanded it for resentencing, and the court decided they wanted to look to the loss of the government, which was not actually taken into account in this case, because he stepped aside from subsection A and went to subsection B and increased it by A. Then we could litigate that issue. But that issue was never actually litigated before the district court because the district court and the probation office said they were going to use subsection B and increase by A levels because he was a public official. The next issue on the sentencing is the grouping issue. The court decided to group into two separate groups, and we believe that was error. The group that was separated was the group which dealt with the issue of the commerce. And essentially our position that's taken here is that the restraint of trade was in fact the same intended harm as the bribery or the wire fraud counts and the money laundering. We see no distinction between the two. The government has made an argument that one includes honest services, and that's the people, and the other includes the government victim. And I suggest that all three crimes, essentially, that is the wire fraud, the bribery, and the claims, all include both the government as a victim and honest services. It's not something that you can pick apart. I mean, this is one small scheme which involved various federal crimes which could be applied, but we don't believe the grouping is appropriate, and we don't believe that the Eggson case cited by the government is appropriate. And there you had a food stamp violation and you had a drug violation, and clearly those are two separate societal interests. But in the issue between the restraint of trade, the bribery, and the wire fraud, it's really one issue. They were all enrolled into one major thing, and that is the honest services of your government employees and the people who were harmed were the government. We've raised the issue on the wire fraud instructions. And indeed, the indictment contained two theories of wire fraud in each individual count. One theory was a theory to deprive the citizens of their rights to honest services, and they relied upon a local ethics statute. And the second theory was to obtain money or property by false promises or statements. The government has said in their 28-K letter that they don't need a unanimity instruction because it's not necessary, and they cite Richardson. In Richardson, they discuss the fact that under the state law, two types of murder could be committed basically using the same finding. But in the issues before the court on the wire fraud, there are different elements as to each of the two frauds, and therefore you can't have unanimity if you have different elements. We've set forth the elements in page 33 as they were set forth by the judge in the jury instructions. And indeed, the judge deleted in the first theory to carry out or attempt to carry out an essential part of the scheme. The judge also, when instructing the jury, did not talk about others' essential elements when he discussed the jury instructions themselves. He further went on to discuss that at a later time when he read the first count for count one. He did not read the entirety of the jury instructions. When he read count two, he completed it, and the government feels that that would be appropriate when he was instructing on the second count. But we believe that the issue needed to be addressed at each count individually because they did contain separate, distinct elements. The excerpts at page 494 set forth how the instructions were carried out with regard to the wire frauds and show that the initial fraud sections did not contain all of the various definitions that should have been included in the first count. We've also raised an issue on the 404B evidence that was induced. And all trial lawyers know the buzzwords to put in their motions and to say to the judge when they're attempting to get an evidence. I mean, I wish we were here to argue that 404B evidence could be stricken forever and come out of our rule books. Unfortunately, that's not a matter that's something this court can address. But I think it's clear when we look at the arguments that were made by the prosecutor in the close of this case, and indeed even look at some of the issues with regard to the arguments in the briefs by the government, that the whole issue is one which is fraught with peril. But in the closing argument, one of the most telling statements was the statement, every time he dealt with Shelton in his official capacity, he had to pay a bribe. That is exactly what 404B evidence is supposed to prevent from happening. We're not here to say that Mr. Shelton, by his previous bad act, was a bad person and predisposed to do things. What we're saying is that this evidence is there to show certain issues, i.e. intent, knowledge, and the like. I've listed a litany of statements that were made in closing argument by the government, which we believe indicate that the government never intended this evidence to come in as 404B evidence, and in fact brought it in for the purpose of establishing that Mr. Shelton was a bad person, and therefore you should convict him. In their brief, the government makes the comment as to the evidence of Mr. Shelton failing to pay income taxes, not having a business license, and doing various other issues. They say that only related to the 15th count. But how do we know that? The judge never instructed the jury that this evidence is coming in for count 15. As we point out in our brief, none of the evidence should have come in for counts 1 and 2 because it wasn't similar to a wire fraud case in any of those matters. But there weren't any instructions. And so the jury had a number of 404B evidence matters, which came in in a shotgun approach, and then they were argued as if they were evidence of actual wrongdoing, which they could use in determining his guilt or innocence, not to determine his intent or his knowledge. And then, even before the brief, this court said, well, there's no harm, no foul, because that only came in as to count 15, but the jury was never told that. And so there is harm and there is foul in regard to those cases. There are a number of issues that were raised in the brief, which I would address at this point, I guess, as the handling of the case in the district court. I agree, and we pointed out to the court, that oftentimes judges make decisions on jurors. And normally you can say it's within their power and duty to make those decisions. And as an attorney and as a prosecutor, when we have a gut feeling about a juror, we can use a peremptory challenge to excuse that juror. But for a judge to say, I have a gut feeling about this juror and I want him off the jury, it's not proper. He's supposed to be unbiased. His gut feelings are not part of the case. He should have some facts to base his decisions upon. And indeed, in some of the issues, he did have some facts. The jurors said they knew the defendant or the defense counsel. One, I think he paid his power bills at her window when she collected payments. One of the women's husbands, and she lived in the apartment house that was owned by the family of the defense lawyer, they said they could be impartial. And the government has pointed out clearly that, of course, you can say you can be impartial, and the judge still is the final arbiter of what he thinks in that case. But I've never seen a case where, on one hand, the judge excuses people who say they can be impartial, who say various other things, and then we have the matters which showed the actions of the judge with regard to Mr. Andrade, who he said, I need a people like you on my jury. You have to stay here. If he'd been an employer telling a reservist or a National Guardsman that he couldn't go to work because he had to go to work, he'd be in violation of federal law. And I think I call those statements outrageous. The government said he was just trying to keep a juror on the case, but I think it was outrageous. And I think when you juxtapose the two situations of who he kept on and who he kept off in his reasoning, I think it establishes that he wasn't basing it on facts and he was showing bias. I've set forth rulings that I feel were prejudicial. I've set forth the issues that he was not allowed to present his defenses, and I've set forth the issue of the continuance. And the continuance was of great concern because the issue had come up as to his bias and potential bias in this case. And rather than giving the counsel for the government, I'm sorry, for the defendant 10 days to research that matter and be able to come back to the court and possibly file a motion, the judge denied his response. He just said outright. Not only did he deny the motion, he said there's no grounds for it, and he proceeded on to sentencing him. And in that sentencing, he went outside the guidelines by three levels, which we feel further establishes bias in this case. I'll reserve the rest of my time. Thank you, Chris. May it please the court, Andrea Limmer for the United States. I'd just like to start out by saying that, of course, the defendant has never challenged the primary facts underlying his conviction. As the director of the Department of Parks and Recreation, Shelton abused his public office at a time, as the court found, when Guam and its citizens needed his services the most. In the wake of a devastating typhoon, he was lining his pockets with bribes, procuring rigged bids, and working to ensure that his illegal activities would not be uncovered. And as a result, Guam was forced to pay several hundred thousand dollars more in disaster relief than it should have. The conviction and the sentence are amply justified by the factual record, and they're also firmly grounded in the facts, in the law. Excuse me. I'll turn first to upward departure, unless the court has some other questions. The defendant claims that the court could not have imposed an upward departure in this case once it imposed the sentence enhancement, the specific offense characteristics of 2C1.1b2 of the bribery statute. But that ignores Application Note 4, which plainly provides that when the monetary value of a bribe, even after considering the specific offense enhancements of 2C1.1b2, still do not adequately reflect the seriousness of an offense, then an upward departure is warranted. And this is precisely such a case. Under 2C1.1b2, there are two parts, A and B. A provides for an offense calculation pursuant to the fraud table that is geared to the loss to the government. B is an automatic eight-level enhancement for bribery of a high-level official. The guideline says if both A and B apply, which they did in this case, then apply the greater. The court found, by a preponderance of the evidence throughout the sentencing proceedings, that the government of Guam lost, in terms of FEMA reimbursement, between $500,000 and $700,000 worth of FEMA reimbursement. Even the defendant admitted, I may have misunderstood what the defendant said, that this loss was not litigated. Between $500,000 and $700,000? Yes, between $500,000 and $700,000. How many levels would that bring you to? That would have been up to a level 14 enhancement under the 2001 guidelines, and a 10-level enhancement under the 97 guidelines. So why didn't he give a reward? He didn't do it because he believed that he was required to find a precise amount by clear and convincing evidence under this Court's decision in Jordan. We disagree that the clear and convincing evidence standard is necessarily appropriate, but we believe that even under that standard, he easily could have found a 14-level enhancement because the loss was at least $500,000. But the Court was concerned that it needed a more precise number, that if it didn't have a precise number of the loss, that, quote, the loss calculation could be questioned. So as a result, the Court felt obligated to impose really the lesser of 2C1.1b2, this 8-level enhancement. And instead of going the additional 6 levels, which under A would have been justified, he really took a very conservative approach in applying only a 3-level upward departure. And he did this for other considerations as well. He wanted to avoid what he called some ex post facto issues. There's the one-book rule. You have to either apply all of the 97 guidelines or all of the 2001 guidelines. And he recognized that although under the 97 guidelines, the fraud table favored the defendant because it would have been a 10-level as opposed to a 14-level, but still the grouping and the money laundering counts in the 97 guidelines were much more severe. The money laundering had a base level of 23 as opposed to 10 in 2001. And the Court wanted to give the benefit of the defendant, the benefit of the doubt, under both guidelines. And this was really a way of giving the defendant a better deal by only doing a 3-level upward departure. And the Court also stated, and his reasons for avoiding ex post facto are at the excerpts of record pages 209 and 210. That's in the sentencing transcript. And he also wanted to avoid having to deal with 5G1.2, which if the offense level comes out to be more than the maximum for a particular crime, the bribery statute has the maximum penalty of 10 years. The Court did not want to go beyond the maximum set by Congress, which it would have had to do if it applied, if it had come out with this 14-level enhancement, because it would have been beyond the 120 months. So to avoid that, he also believed that an upward departure was a less onerous result. And his reasoning there is at excerpts of record 242 and 243. Again, I don't know if I misunderstood what the defense counsel said about there not being any discussion or evidence in the record about the loss to Guam, because the whole sentencing transcript is just replete with information about the loss to Guam. Government Exhibit GX93 that was presented at the sentencing hearing shows the amount of money that FEMA had set aside in potential reimbursements to the government of Guam. It showed what monies had been reimbursed, and the government deducted those monies from the amount still outstanding. And the defendant himself conceded at the sentencing hearing that the projects that were the subject of these bribes, for which Guam had not yet received FEMA reimbursement, totaled over $600,000. Now, the defendant said, we don't necessarily concede that this is a loss to Guam, because sometime, someday in the future, Guam may still go to FEMA and say, we want this money, and they may get it, which is pure speculation. And they also said, as defense counsel has said just now to the court, that we think that that $600,000 should be reduced because Guam got work, got the work done on these projects. But that isn't the point. Guam was entitled not only to the work, but to 90 percent of that work being reimbursed by FEMA. And this is exactly what the sentencing guidelines did not take into account and why the court applied the upward departure. Well, the upward departure was applied on two bases. The court described them as two separate grounds. It said, and one was what you were just describing, that they didn't get reimbursement in a timely manner and perhaps permanently. Then it says the second aggravating circumstance has to do with something else. It's intangible. The intangible. And that has to do with future disasters where FEMA may not act as promptly. The second, apparently based on some evidence, that FEMA would put more inspectors in and would look more carefully. Because they would only pay legitimate claims. Well, it's not only, Agent Song testified at the sentencing hearing that there had been a recent earthquake in Guam. And he had talked to FEMA people in charge of the earthquake assistance. And this Mr. Lou Boda who was in charge of that, because of the Shelton corruption in the prior case, had said that they were front-loading the whole FEMA inspection process. FEMA was incurring more expenses because it was bringing more inspectors to the site ab initio, instead of waiting to afterwards to see whether the work was complete and then examining the documentation. He was saying documentation, documentation, documentation right up front. Excuse me? I mean, what's the harm with that? No, the harm. I mean, basically FEMA's coming in earlier. Yes, but. They're requiring more documentation isn't a bad thing. No, but what the court was saying in terms of the intangible potential loss to Guam was that the money might not be available on as timely a basis. What the court said was Guam is in this disaster zone. We're subject to earthquakes and typhoons a lot. And we need the restoration of water and electric and services quickly and expeditiously. I just don't see the leap between requiring, sending in more inspectors earlier to check documentation than necessarily the time. It seems to me you could not send inspectors, require documentation, and the payments would be delayed. Well, I. So basically what they're saying is front loading. They're not saying the payments will be delayed. Well, they, I think the court was assuming that they could be, you know, delayed or requiring something more that maybe Guam would not be able to. Well, see, that's my problem. It's an assumption not subject to proof. Well, I think that that's true, Your Honor. And I, but I don't think that the underlying facts are mistaken. If you would not draw the same conclusion, in other words, from these facts, that disaster relief might be delayed because of these additional procedural burdens, I think it was not an abuse of discretion of the court to think that these might pose additional burdens that might delay the receipt of FEMA funding. I don't know. Your use of three mights in there tends to indicate that there were ponderance to the evidence. Wasn't that? Well, you know, this, I think this was a second factor and maybe a lesser factor. And I would also point out to the court that the United States agreed that if the court had sentenced under A instead of B of 2C1.1B2 and gotten the 14-level enhancement, clearly was appropriate, then there would have been no need for further departure because of this other intangible theory. But you didn't. At the time of this, you didn't. How was he sentenced under the 8th and then said, for the upper departure justification, the court finds the existence of two aggravating circumstances of a kind or degree not adequately taken into consideration. One is clearly appropriate problem. The second is the one we have been discussing. If the second is not appropriate, my understanding of the cases is that we have to set that aside. At least we can't allow it to stand. It has to be remanded or stricken, one or the other. Do you have a different view if there's one proper basis and one improper basis? I don't know if Your Honor is referring to a specific case. I do not know of any case that would say. There's one called U.S. v. Parra and U.S. v. Reyes, which is an unsuitable case. Well, I have to say, Your Honor, that I have to plead ignorance on that issue, and it is not one that I have considered. I'm not surprised that you haven't, and I'm not sure that that's what it says. That was my understanding from the reading of that case, that if one is invalid and one is not, but I wonder if you had a different view, if you had thought about that. No, I haven't, Your Honor. I must confess. But I do think that certainly the one lack of FEMA reimbursement alone is sufficient to sustain what the Court did in this case. I think the question is procedurally if there's one defective, whether we're obligated to determine that even though there's an alternative. I mean, I think Judge Reinhardt's correct, is that you're not sure about the basis of the district court's decision. I think it's two that you may have to reassess on. Well, I mean, it seems to me, though, that the Court could say that this alone satisfies the preponderance of the evidence. I mean, I understand what you're saying, that we don't know that the judge made that finding, although I do have to say that under the PROTECT Act now, the new standards on upward departure, upward and downward departures, mentioned in our 20HA letter as of April 30th, it's de novo review. That makes it worse for you. Well, I don't think so, because I think as de novo review, you could easily find that the upward departure is warranted by the lack of FEMA reimbursement alone. If we don't have time, might I jump ahead to a different issue? Sure, sure. In this case, reading the transcript, I must say I found it a little disturbing during the voir dire that the judge took such an active role. Not that that's unusual, I guess, in and of itself, but I just have never seen, at least in my recollection, this number of sua sponte dismissals for what I guess appears to be less than the standard cause, the standards of cause. I mean, I've got to keep you on this, jury, this was certainly not a great bit of transcript for you. No, I agree, Your Honor, to an extent. Somebody dismissing somebody for cause because of body language is very unusual. Let me cut to the chase. The impression that one gets through some of the reading of the voir dire is that the judge was interested in a particular panel hearing the case. I mean, I think that is so far from the truth when the whole voir dire is read, because there were jurors retained who were friends and relatives of defense counsel. But everybody knew the defense counsel and the family, as far as I can tell. But the defendant didn't object. The only objection the defendant made was to Amy Cruz, who was a close family relative of the defendant. And with respect to Juror Andrade, the military man, I have several points that I would like to make with respect to that. I don't forget them. One is that he did not serve on the panel. Pages 841 and 842 list the names of the jurors who were ultimately selected. This was just creating the big super pool, and Andrade was not on the panel, ultimately. He did not serve. This colloquy that went on with Andrade was not in open court. It was between the judge and the two lawyers and this one juror. So the language was something that you would not want to hear in open court, clearly. It's unusual to hear on the record in open court. But I think when you look at this. I rarely have seen the district that use pepper language with, let's say, off-color remarks. You know, I think what I'm getting is this. Here was a guy who's a military man. He was concerned that he was going to get in trouble with his superior officers. And, I mean, we know the jurors are concerned about serving on a jury and what it will do and how it will impact their lives. And the judge was trying to impress upon this man that he shouldn't worry about getting into trouble because, you know, it was okay that he would. But then when he says, I need you on this jury, it's, you know, certainly not. He's rejecting other people for body language. And he's telling this guy, I need your discipline. I need your attention. I need you. Looks like it from a poster. I want you on the jury. Yeah. I mean, you know, I'm not going to defend the judge for that language. But I think when you look at the whole record and the lack of prejudice, the defendant has not shown that he had any particular interest in having this juror serve or not serve. And he had no, you know, even with respect to the other jurors, I mean, the body language. How would you ever win on that claim? I mean, how would you ever show prejudice? I mean, if you're saying that basically the judge was handpicking a panel, I don't see how a defendant could ever show prejudice from that because, of course, you can't go out and say to a juror, gee, you would have voted for me. Explain to me how one would show prejudice. Well, I think that the cases that do it is because you're excluding because of race and there are obvious reasons why you have an interest in certain people serving or not serving. And this was not that kind of case. And, you know, I don't think how you could say that the judge was prejudicing the defendant even by saying this because, you know, there's no evidence that this juror would have been pro or con came to deciding for the defendant. Well, how would there ever be evidence? That's just how it is. Let's suppose the judge said, listen, you two stay out of this. I'm going to pick the category I want. And he decided to excuse a lot of people. Then the question would be, does that prejudice the defendant? And you'd say, well, there's no evidence that those jurors would have voted one way or the other. Well, I think that this clearly is an overstatement of what the judge was doing here. I didn't say that's what he did. Yeah, no, I understand your point, Your Honor. It's a hypothetical question which we dealt with earlier today. It's hard to get an answer to that. I hope that I can be more forthcoming in answering your hypotheticals. One of your arguments is they didn't show prejudice. And that's what I'm focusing on because I'm not sure that this is a question of having to show prejudice because, first of all, I don't think you ever could. And, secondly, I'm not sure it would be proper for someone to say, I've got a great juror here who would have been favorable for me to dismiss. I think the question is whether or not the interference was such that we're looking at a hand-picked jury. Now, it may or may not be in this case, but I think you'd have to say that it starts to appear that way. Well, I believe it's the gay case that we cite in our brief that says that the defendant hasn't shown. So I'm not just picking this sort of standard out of the air, but it says that the defendant didn't have a particular interest in this jury or not. And I really don't know in what other case the court is referring to that the judge was hand-picking the jury. One guy he excused because he had emotional problems. He'd been through the criminal system. He had had a drinking problem. I think it was perfectly legitimate for the court to think that this guy might not be able to handle the pressures of a sequestered jury. And, you know, the court has a right to look. I think the court has a right to look. In fact, in obligations, the reason that appellate courts often defer to trial courts is because the trial courts can look at the witnesses and the body language. I don't think I've ever seen this level of interference. Well, I'm using interference. But this level of activity on a ward here, where the judge is questioning and then sua sponte, dismissing people for cause, for reasons that don't appear to be cause. Body language is not cause. Having a prior experience with the criminal justice system isn't cause. That may be a good grounds for a peremptory challenge. Trying to keep somebody on is not admirable behavior. Well. As far as the question going, reassuring that he is a plumber, perfectly proper, even though it's salty language. But to say, I need you on the jury, when you're not saying that to other jurors. I think that was an injudicious use of words. But I don't think that it really displays in the context of what he was doing. He was trying to tell the jury, listen, you know, the value of jury service, the importance of it. And I think the language he used was inappropriate. But that the whole tenor of it was, he wants to keep as many people on the jury as he can. Other jurors that he excused, one of them had to go to the dentist and was going to get a cap on her tooth. And this was a sequester jury. I mean, I don't know what other. Well, that's a little odd also. But I don't think it makes any difference in this case. You know, to just take it. That was an alternate juror. So it really didn't matter. But I think if in the middle of a trial he had just excused a juror who just mentioned she had to get a cap and taken her out of the jury, it's not such a big deal to go to a dentist. Maybe it is in Guam, I don't know. But normally you don't have to get off a jury or get out of work because you have a cap to replace. You go to the dentist at the end of the day, and you make two visits, both at 5 o'clock, and you get a cap. Well, if you can find a dentist at 5 o'clock in Guam, you can't find one in Owens in Virginia. That city outranked everybody in trying to get a dentist for the juror. You know, I really do believe that when looked, there were jurors who. Well, it's like the first case we've had from Guam, you know. So we're kind of familiar with it. We've seen Guam cases, and I guess that underscores a little bit of concern here. One has been waiting to transfer. Again, you know, no objection, no plain error. You know, I don't even think there's a colorable claim of prejudice to the defendant from the jury verdict. Andrade didn't serve on the jury. But, again, I don't want to belabor this point that, you know, I think. Would you mind talking about the 404B evidence? Oh, heavens. It seems to me, and I understand your theory on 404B, but it does seem to me in this case that it was argued as predisposition evidence rather than lack of mistake. Tell me why you don't think that's so. The 404B evidence was introduced for two reasons. To show lack of mistake or accident. To show the defendant intended his acts in taking bribes and rigging bids. The Flores Park evidence was between the same people. It was bribery. This is the kind of evidence that goes in typically, I think, in big rigging cases where, you know, innocence or lack of intent is part of the crime. And it was also very important, Yoon's testimony with respect to the jet ski evidence, because it showed how Yoon first came to meet Shelton. It was sort of background to all this bribery stuff. Yoon went to Shelton to get a permit and bribed him. And that's how Shelton knew that he could approach Yoon when it came time to allocating these jobs. And he knew that Yoon would be willing to give him the bribes and to work with him on this. And I think this is, you know, classic 404B evidence. 404B is not a rule of exclusion. It's a rule of inclusion. And the only reason not to include stuff is if it's highly inflammatory or prejudicial. Or if it solely goes to prove that a defendant is a bad guy. And that wasn't what this was all about. And in the government's closing, now I don't have the site to the record, but the government in closing explained that this is to show defendants' intent. It's not to show that he committed these crimes. Before and after all the 404B evidence was admitted, the court instructed the jury that this is only to show intent and lack of mistake. The defendant has made this argument on appeal that was never raised below that somehow the court had to charge the jury that this is only coming in with respect to certain counts. He never asked for such an instruction in the trial court. And it was clear Yoon was testifying about the bid rigging and the bribery on three of the projects. And the 404B evidence was brought in with respect to his testimony about those projects. When Yoon was testifying, the court didn't tell the jury this testimony is only related to counts 1 and 2 and not 4 and 5. What would, you know, it would be silly to say, well, the 404B evidence only relates to certain counts. It was clear in the context of what was being presented that Yoon is testifying, this is how I knew Shelton, this Jetski 404B evidence comes in to show that this is how I met Shelton and this is why he called me after in the wake of PACA. The same with the things relating to count 15 on which the jury acquitted. The evidence came in with respect to what the agent, what Agent Cicotta was testifying to about count 15, the failure to report income. So, I mean, this is a new argument on appeal about making the jury, telling the jury that this only relates to certain counts. And in addition, really, the evidence related to the bribery and the wire fraud and the bid rigging, so that there wouldn't have been any reason to pinpoint it for the jury because the defendant was acquitted on count 15 and that's the only thing that the Yoon testimony would not have related to. So I really, you know, don't particularly even understand the argument. And again... Well, because it's prejudicial, of course. Excuse me? 404B. Yes. By its nature, it's usually fairly prejudicial. Well... It doesn't mean it's indivisible, but it certainly means it usually is prejudicial. Well, it shows that the defendant can't argue that, well, I didn't mean it and, you know, this was an accident or innocent and that's the purpose of it and it's a legitimate purpose under the federal rules. I don't know. Is there any other specific argument that you would like me to address? The defendant mentioned the wire fraud. I'd like to send your time of work. Unless there is... My time is up. We're well over time. Yes. I see the red light. I got carried away. At least you gave us a reason to avoid the trip. Okay. The issue of the application note 4 to the sentencing guidelines applies to A, that is, the loss to the government, if you're not using B, an increase because you're an elected official and you can't determine how much it is. In this case, they chose B and, therefore, note A is not applicable because they've already made a decision that they're going to increase by 8 and you don't need to worry about the loss to the government. However, the court then again did go to the loss to the government. In their argument, they indicated that their determination of the loss was $500,000 to $700,000, and, indeed, we addressed that in our brief, and when that came up at the sentencing hearing, the judge said, there is no proof that all this is accurate or, indeed, permanently loss to the government or that FEMA would have unquestionably reimbursed the full 90% of the expenditures. FEMA regulations do make a partial or total allowance possible, citing sentencing transcript at page 175. So, I mean, the issue of what they were facing and what he was facing was not really litigated because they jumped from the loss to the government to the 8-point increase for being a public official, but then the judge usurped that same loss to the government argument again as one of the reasons he went outside the guidelines and departed. The issue with regard to the 404-B, the government filed a motion with regard to, well, two motions. The second was 404-B evidence that they wanted admitted as to count 15. The judge never instructed the jury, the defense counsel never asked for the instruction, that this evidence is being introduced for the purposes of count 15. So why is that a plain error? Well, he got acquitted, and I guess the issue becomes how much error becomes plain error, and I've issued a lot of decisions and issues that are here before this court and jammed them into 48 pages as easily as I could. As the court has indicated, 404-B evidence by itself is prejudicial. The question is the admissibility of it. You admit it for certain reasons, but if you don't tell the jury what those reasons are, and then you argue reasons that are not for the admissions, then you have plainly affected the jury's ability to weigh the evidence and apply it as it's supposed to have been applied in this case, and as they shotgun it against counts 1 through counts 15. And when you take a situation where you paint someone with a broad stroke as not paying his taxes, not having a license, not doing all of these various things, the fact that it was supposed to be applicable to one count, and granted, I don't know that jurors can follow instructions in that regard, but they're supposed to, and the court's supposed to instruct them. The motion was specifically for count 15, not for counts 1 through 14, and they should have been instructed, and now they have this evidence that they're not told they're not supposed to use in reaching a determination not only as to the credibility of the defendant's case, which was not allowed to be presented, but also that goes to the credibility of the other witnesses against them. If you think this guy's a bad guy, then maybe this other witness, Mr. Yoon, or the others who were testifying against him, are more credible. And it's an amorphous mixture when you're in trial as what's going to influence that jury to make its decisions. And once they get all of that information without being told how to use it, it becomes prejudicial. Thank you. Thank you all very much. Case test argued will be submitted. The court will stand in recess for the day. All rise. This court's discussion is now adjourned. Thank you.
judges: Reinhardt, Thomas, Clifton